**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Elton Royce WINCHESTER,
Defendant–Appellant.**

No. 89–3761.

United States Court of Appeals,
Eleventh Circuit.

Nov. 1, 1990.

Thomas S. Keith, Asst. Federal Public Defender, Pensacola, Fla., for defendant-appellant.

Stephen P. Preisser, Asst. U.S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before EDMONDSON and BIRCH, Circuit Judges, and RE *, Chief Judge.

RE, Chief Judge:

Defendant-appellant, Elton Royce Winchester, appeals from his conviction, after a jury trial, for possession of a firearm after having been convicted of "a crime punishable by imprisonment for a term exceeding one year," under 18 U.S.C. § 922(g)(1) (1988), and possession of a firearm while "a fugitive from justice," under 18 U.S.C. § 922(g)(2) (1988). Winchester also appeals from the district court's imposition of consecutive sentences.

Prior to trial, Winchester had moved to suppress the firearm, contending that the warrantless search of his rented cottage by several United States Marshals violated his fourth amendment rights. The district court denied the motion, stating that Winchester, who had driven away from the cottage while it was the subject of surveillance by uniformed police officers, had abandoned the cottage and the property contained in it, prior to the search.

Winchester contends that the trial court erred in denying his motion to suppress the firearm, and in failing to instruct the jury

---

* Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by designation.

that, in order to convict Winchester of the offenses charged, the government must prove that he "knowingly possessed" the firearm. Winchester also contends that the district court erred in imposing consecutive sentences when both offenses were based on the possession of the same firearm at the same time.

The questions presented are:

(1) whether the district court erred in determining that the search by law enforcement officers did not violate Winchester's fourth amendment rights because, prior to the search, Winchester had abandoned the cottage and all property contained in it, including the firearm;

(2) whether the district court erred in refusing to instruct the jury that, to be convicted of the offenses charged, Winchester had to "knowingly possess" the firearm; and

(3) whether the district court erred in sentencing Winchester, after his conviction on the two offenses charged, to consecutive terms of imprisonment for possession of the same firearm at the same time.

Since we find that the district court did not err in denying Winchester's motion to suppress, or in its jury instructions, we affirm the convictions. Since we find, however, that the district court erred in imposing consecutive sentences, we reverse and remand for resentencing.

## BACKGROUND

After receiving information, on September 30, 1987, that Elton Royce Winchester, a federal fugitive, was living at a housing complex in Pensacola, Florida, the United States Marshals Service began a stakeout of the complex. On October 1, the Pensacola Office of the Marshals Service received further information indicating that Winchester was living in cottage C. At 4:00 p.m. on October 1, the marshals observed a male and female drive up to cottage C in a Lincoln Continental, park, and enter the cottage. Later, the male left the cottage, got into a Dodge automobile, and drove away. It was later determined that the male was Winchester.

Subsequently, after obtaining the consent of the female, Jerilyn Sachs, the marshals searched the cottage. Behind a sofa, the marshals discovered a travel bag, containing papers and photographs indicating that it belonged to Winchester. A firearm, a 9 mm. Glock, was also found in the travel bag.

On September 28, 1988, Winchester was indicted on two counts of possession of a firearm, under 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 922(g)(2). Winchester moved to suppress the firearm, asserting that the search violated the prohibition against unreasonable searches and seizures of the fourth amendment to the United States Constitution. The district court concluded that prior to the search, Winchester had abandoned the cottage and all property in it, and, therefore, denied the motion. The case was tried before a jury and, on July 20, 1989, the jury returned a verdict of guilty on both counts. Winchester was sentenced to two consecutive terms of imprisonment of four years.

## DISCUSSION

### 1. *Motion to Suppress*

■ The concept of abandonment, in fourth amendment law, "involves a factual issue which is generally reviewed under a clearly erroneous standard." *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir.1987). Furthermore, in determining whether there has been an abandonment, "the critical inquiry is 'whether the person prejudiced by the search ... voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search.*'" *Id.* at 1546 (emphasis in original) (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir.), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982)).

■ From the evidence adduced at trial, it is clear that there was sufficient evidence for the district court to conclude that, when Winchester left the cottage, he had aban-

doned the cottage and all property contained in it. The government presented the testimony of several Deputy United States Marshals. Deputy Marshal James McGregor testified that Winchester had been a federal fugitive since 1985, and that Winchester "knew he was a wanted fugitive." Deputy Marshal McGregor also stated that Winchester had written several letters to the Marshals Service, taunting them at their inability to catch him. A second officer, Deputy Marshal Eric Thompson, testified that Winchester had a history of taunting the marshals. Deputy Marshal Thompson stated that, in 1985, shortly after evading an attempted arrest, Winchester sent the Marshals Service a letter and a photograph of himself.

The marshals also testified about the events leading up to the search of Winchester's cottage. Deputy Marshal McGregor stated that, upon leaving the cottage, Winchester "drove right past" marked police cars and a "bed" of approximately twenty-five police officers who were preparing for a stakeout of the cottage. Deputy Marshal McGregor further stated that:

> as Mr. Winchester was leaving, I could see uniformed deputy sheriffs and SWAT members from the Escambia County Sheriff's Office quite visible, there was no doubt in my mind that these were police officers and I would find it very hard to believe that anyone in the immediate area would not see these police officers.

■ In addition, events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time. *See United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir.1987). Deputy Marshal McGregor testified that he remained at the cottage until midnight, and that Winchester did not return. Deputy Marshal Eric Thompson testified that, the day after the search, he received a telephone call from a person who identified himself as Winchester. Deputy Marshal Thompson stated that the person referred to the type of gun that had been seized at the cottage,

and asked Thompson " 'How do you like that Glock?' "

Hence, the district court was not clearly erroneous in its determination that, prior to the search, Winchester abandoned the cottage and the property contained in it, including the firearm. Accordingly, we conclude that the court did not err in denying Winchester's motion to suppress.

### 2. *Jury Instructions*

■ It is axiomatic that, in a criminal case, the instructions given to the jury must require the jury to find every element of the crime charged, under the proper standard of proof. *See Cabana v. Bullock*, 474 U.S. 376, 384, 106 S.Ct. 689, 695, 88 L.Ed.2d 704 (1986). Nevertheless, it is well established in this circuit that the district court's failure properly to instruct the jury does not always amount to reversible error. Rather, the refusal of the district court to give a requested instruction to the jury "constitutes reversible error if and only if the requested instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendants' ability to defend." *United States v. Stone*, 702 F.2d 1333, 1339 (11th Cir.1983). *See also United States v. Gold*, 743 F.2d 800, 819 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). Furthermore, we have stated that "the district court has broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts." *Gold*, 743 F.2d at 819.

In this case, it is not disputed that, in order for Winchester to be convicted under 18 U.S.C. § 922(g)(1) and (2), it must be proved that he "knowingly possessed" the firearm. *See, e.g., United States v. Sherbondy*, 865 F.2d 996, 1001–02 (9th Cir. 1988).

■ Winchester contends that "the trial court erred in refusing to instruct the jury that it had to be proven that the defendant knowingly possessed the firearm in question." Winchester asserts that "[t]he trial

court's failure to instruct the jury regarding 'knowingly' was very prejudicial to the defendant in light of his defense of lack of knowledge."

It is clear, however, that under the standard established by this circuit, the jury instructions in this case do not constitute reversible error. We are satisfied that the requirement that Winchester have "knowingly possessed" the firearm was "substantially covered by other instructions which were delivered by the district court." *Stone*, 702 F.2d at 1339. On the issue of "possession," the court charged the jury that:

> [T]he law recognizes different kinds of possession. A person may have actual possession or constructive possession.... A person who has direct physical control of something on or around his person is then in actual possession of it. A person who is not in actual possession but who has both the power and the intention to later take control over something ... is in constructive possession of it.... Whenever the word "possession" has been used in these instructions it includes actual as well as constructive possession....

Hence, in the jury instructions, the court defined "constructive possession" as impliedly requiring knowledge or awareness of the object possessed.

■ In addition, under the circumstances of this case, it is clear that the district court did not abuse its discretion in refusing to give Winchester's requested jury instruction. *See Gold*, 743 F.2d at 819. There was sufficient evidence for the jury to conclude that Winchester "knowingly possessed" the firearm. The travel bag, which contained the firearm, had papers and photographs identifying it as belonging to Winchester, and although no fingerprints were found on the firearm, Winchester's fingerprints were found on various items in the bag.

Consequently, under the standard established by this circuit, the district court's failure to give the jury specific instructions on what constitutes "knowing possession" does not constitute reversible error.

### 3. *Sentencing*

■ The statute under which Winchester was convicted, which was enacted as part of the Gun Control Act of 1968, provides that:

> It shall be unlawful for any person—
>
> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> (2) who is a fugitive from justice;
>
> (3) who is an unlawful user of or addicted to any controlled substance ...;
>
> (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;
>
> (5) who, being an alien, is illegally or unlawfully in the United States;
>
> (6) who has been discharged from the Armed Forces under dishonorable conditions; or
>
> (7) who, having been a citizen of the United States, has renounced his citizenship;
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g) (1988).

The statute does not expressly indicate whether Congress intended to permit consecutive sentencing for the same incident under two subdivisions of section 922(g). Under 18 U.S.C. § 924(a)(2), Congress provided criminal penalties for the violation of subsection (g) of section 922, but it did not list separate penalties for the separate subdivisions of subsection (g). Furthermore, each subdivision of subsection (g) differs only in its requirement that the offender have a certain "status" under the law.

The title of the statute, the Gun Control Act of 1968, leaves no doubt that the statutory purpose is to limit or control the possession of firearms. The statutory structure indicates that, in enacting section 922(g), Congress sought only to bar the possession of firearms by certain types of persons that it considered dangerous. It

does not suggest that Congress also sought to punish persons, who are described in the various categories set forth in section 922(g), solely for having a certain status under the law.

In addition, while section 922(g) prohibits *the possession* of firearms by persons described in its subdivisions, section 922(d) prohibits *the sale* of firearms to the same categories of persons. As the Supreme Court noted, "[t]he very structure of the Gun Control Act demonstrates that Congress ... sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976). Hence, it would appear that, in enacting section 922(g), it was not within Congress' comprehension or intention that a person could be sentenced, for a single incident, under more than one of the subdivisions of section 922(g).

Nevertheless, the government contends that its interpretation of section 922(g) is supported by *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), in which the Supreme Court established a test to determine whether a defendant may be sentenced to consecutive terms of imprisonment "where the same act or transaction constitutes a violation of two distinct statutory provisions...." Under *Blockburger*, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* See also *Ball v. United States*, 470 U.S. 856, 861–62, 105 S.Ct. 1668, 1671–72, 84 L.Ed.2d 740 (1985).

In this case, Winchester's conviction under section 922(g)(1) required the jury to find that he was convicted of "a crime punishable by imprisonment for a term exceeding one year," and his conviction under section 922(g)(2) required the jury to find that he was "a fugitive from justice." It is not disputed that, in this case, each offense "requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. According to the govern-

ment, "[i]t is this distinction as to the status of the Defendant that warrants the conclusion that cumulative punishments for conviction ... are proper."

We do not agree with the government's contention. In *Blockburger*, the defendant was sentenced under sections 1 and 2 of the Harrison Narcotic Act. *See Blockburger*, 284 U.S. at 303, 52 S.Ct. at 181. Under section 1, the defendant had unlawfully sold a drug which was not contained in its original stamped package, and under section 2 the defendant had unlawfully sold the same drug without a statutorily required written order. *See id.* at 303–04, 52 S.Ct. at 181–82. In contrast, in this case, the defendant was sentenced under two subsections of the same section of the governing statute.

Furthermore, the *Blockburger* test only provides guidance in ascertaining Congressional intent. *See Garrett v. United States*, 471 U.S. 773, 778–79, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985). It "must of course yield to a plainly expressed contrary view on the part of Congress." *Id.* at 779, 105 S.Ct. at 2412.

The statutory language and legislative history of the Gun Control Act of 1968 reveal that Congress' intent was to prohibit the possession of firearms by classes of individuals it deemed dangerous, rather than to punish persons solely for having a certain status under the law. Section 922(g) was enacted by Congress as part of the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213 (1968). The Report of the Judiciary Committee of the House of Representatives states that section 922(g) was intended to prohibit the possession of firearms by felons, fugitives, persons under indictment, persons addicted to narcotics, or persons committed to mental institutions. *See* H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 4410, 4421. As originally drafted, section 922(g) only prohibited possession of a firearm by felons, fugitives, and persons under indictment. An amendment of the House Judiciary Committee added persons addicted to narcotics and

persons committed to mental institutions. *See id.*

The Report of the Judiciary Committee does not indicate whether Congress intended that persons who are described under more than one of the subdivisions listed in subsection (g) may be sentenced to consecutive terms. The Conference Report also does not provide any indication of congressional intent on the question of consecutive sentencing under section 922(g). *See* H.R. Conf.Rep. No. 1956, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 4426, 4429-30. In 1986, the Firearms Owners' Protection Act amended section 922(g) by adding to the list of persons prohibited from the possession of firearms. The Act added illegal aliens, persons with dishonorable discharges from the armed forces, and persons who have renounced United States citizenship. *See* Pub.L. No. 99-308, § 102(6)(C), 100 Stat. 449, 452 (1986).

In its interpretation of a statute, the court may look to canons and rules of statutory interpretation, and, for further support, in a criminal case, may also apply the rule of lenity. *See, e.g., Simpson v. United States*, 435 U.S. 6, 14-15, 98 S.Ct. 909, 913-14, 55 L.Ed.2d 70 (1978). By the application of lenity, courts " 'will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.' " *Id.* at 15, 98 S.Ct. at 914 (quoting *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958)).

Lenity, the quality of being lenient or merciful, is an application of the common law principle that criminal statutes are to be strictly construed, a rule which "is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 35, 43, 5 L.Ed. 37 (1820). The rule "rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature." 3 N. Singer, *Sutherland Statutory Construction* § 59.03 (4th ed. 1986). It is "an outgrowth of our reluctance to increase or multiply punishments absent a clear and definite legislative directive." *Simpson*, 435 U.S. at 15-16, 98 S.Ct. at 914. Furthermore, the Supreme Court has stated specifically that lenity "applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). *See also United States v. McGoff*, 831 F.2d 1071, 1095 (D.C. Cir.1987), in which the court of appeals, in affirming a decision of the district court on a question of statutory interpretation, noted that "our holding finds solid support in the well-established principle of interpretation of criminal statutes known as the rule of lenity."

Furthermore, the government's interpretation of section 922(g) would lead to an anomalous and draconian result. Under the government's interpretation, a defendant, who was described under one or more of the statuses listed in the numbered subdivisions contained in subsection (g), could be sentenced consecutively under each status. Hence, a convicted felon who is also a fugitive from justice, a drug addict, a "mental defective," and an illegal alien, could be sentenced to five consecutive terms of imprisonment for the same incident, namely, the possession of a firearm. It was this interpretation of the statute which led to Winchester's being sentenced to two consecutive terms. To avoid such a result, we hold that Congress did not intend to provide for the punishment of a defendant under two or more separate subdivisions of 18 U.S.C. § 922(g).

It should also be noted that we have previously construed section 922(g) strictly on a question of sentencing under more than one count. In *United States v. Grinkiewicz*, 873 F.2d 253 (11th Cir.1989), the defendant, who had previously been convicted of a felony, was convicted and sentenced on six counts of the possession of a firearm, under section 922(g)(1). The six counts of the indictment arose from the possession of six firearms, on a single occasion, at the defendant's place of business. *See id.* at 255. Quoting from *United States v. Smith*, 591 F.2d 1105, 1107 (5th

Cir.1979), we stated that "[t]he 'simultaneous possession of several weapons constitutes only one offense under Section [922(g)]," and therefore reversed and remanded for resentencing. *Grinkiewicz*, 873 F.2d at 255.

Accordingly, in this case, we conclude that the district court erred in sentencing Winchester to consecutive terms of imprisonment.

## CONCLUSION

Since we find no reversible error in the district court's denial of Winchester's motion to suppress and in its denial of his request for jury instructions on the issue of "knowing possession," we AFFIRM the jury verdict of guilty. However, since the district court erred in sentencing Winchester to consecutive terms of imprisonment for the possession of a single firearm on a single occasion, we REVERSE the sentencing, and REMAND for resentencing.