# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 23, 2010

No. 08-40406

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

KEELON JMAR SENEGAL; BRODERICK WADE YORK,

Defendants–Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 3:06-cr-0008-2

Before HIGGINBOTHAM, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Keelon Jmar Senegal and Broderick Wade York appeal their convictions for eight separate counts stemming from a botched bank robbery and a subsequent attempt to murder a witness, which resulted in multiple consecutive life sentences for each of them. They allege various errors, including a *Brady* violation, improper admission of hearsay statements, insufficiency of the evidence, partiality of the trial judge, and sentencing violations.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-40406

For the reasons discussed below, we affirm Senegal and York's convictions on all counts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

#### 1.    The University Federal Credit Union Robbery

In July 2005, Arthur Winn and John Franklin successfully robbed the Coastal County Credit Union.  Winn and Franklin decided to try their luck again, and set their sights on the University Federal Credit Union ("UFCU") in Galveston, Texas.  They recruited Senegal, York, and York's cousin, DeWayne Lekeith "Ki-Ki" Joseph, to assist with the heist, although Joseph later backed out of the scheme.

The four decided that Winn would steal two cars and serve as the getaway driver, Franklin would hold open the door to the bank, and Senegal and York would enter the bank to carry out the robbery.  In August 2005, the four drove a stolen Chevrolet Suburban to the UFCU and commenced the robbery according to their assigned roles.  Senegal and York obtained almost $10,000 from the bank tellers, and then ran back to the Suburban.

Once inside the Suburban, a dye pack that one of the tellers had slipped into the money bag exploded.  At that moment, the Suburban stopped running.  The four abandoned the Suburban and continued their escape in a stolen Buick that Winn had parked nearby as a backup getaway vehicle.

Because they feared that someone had followed them, they decided to ditch the Buick and continue fleeing in Franklin's personal Chevrolet Impala.  The four parked the Buick close to where Franklin had left his car, and waited for him to retrieve it and return for them.  Franklin, still scared that someone had followed him, never picked up the others.

While Winn, Senegal, and York waited for Franklin, Winn saw Tony Mason drive past.  Winn, who knew Mason from his days in a street gang,

2

flagged Mason, and Mason agreed to drive the three to Winn's mother's house. While en route, York began to discuss the botched robbery, and Winn quickly instructed him to be quiet. Upon arriving at Winn's mother's house, Senegal gave Mason a handful of money from the UFCU robbery.

### 2. Senegal and York's Possession of a Lorcin Pistol

A few days after the UFCU robbery, Senegal told his cousin, Jasmine Epps, about his involvement. Around this time, Epps witnessed Senegal with a silver gun while visiting Senegal's girlfriend, Tesse Rolland. Epps saw Senegal and Rolland playing with the firearm before Rolland took the gun into her bedroom. Rolland testified to the grand jury that she saw York give the gun to Senegal. At trial, however, Rolland recanted and testified that she knew nothing about the weapon.

Police officers seized the firearm while arresting Epps at Rolland's apartment sometime later for an unrelated crime, and identified the weapon as a Lorcin pistol. Upon her release, Epps called Senegal at Rolland's apartment, at which point Senegal cursed and shouted at Epps because he did not want her to tell the police about his participation in the UFCU robbery. Epps later identified the recovered Lorcin pistol as the same one she observed Senegal and Rolland playing with shortly after the UFCU robbery.

### 3. The Attempted Murder of Tony Mason

York began to fear that the police would associate him with the UFCU robbery and decided to seek help from Joseph. York discussed the botched robbery with Joseph, detailing the various ways he believed the police could tie him and the others to the crime. Later, Senegal and York heard that the police had arrested Mason for traffic warrants. Fearing that Mason would implicate them in the UFCU robbery, Senegal and York contacted Joseph again to discuss killing Mason.

In late September 2005, Joseph, Senegal, and York drove a stolen Jeep Cherokee while searching for drug dealers to rob.  According to Joseph, at some point during the drive, York started to get upset with him.  Joseph asked that the two let him out of the Jeep, and Senegal and York complied.

After leaving Joseph, Senegal and York drove to Mason's house, donning bandanas over their faces.  Senegal, with his gun drawn, approached Mason while Mason worked on his car.  When he attempted to fire, however, his gun jammed. York decided to try with his weapon, and successfully shot Mason once.  Mason fled into the courtyard of his apartment building, but fell after a short distance.  York approached Mason to shoot him a second time, but his gun also jammed before he could fire another round.  Mason stood up and continued his escape, and eventually the paramedics found him.  Mason remained in a coma for nearly a month, but survived.

### 4.    The Robbery of Adrian DeVault

Later that evening, Senegal and York approached Adrian DeVault while DeVault sat in his car in an apartment parking lot.  They pulled their weapons and demanded DeVault's valuables, securing a chain, a black Movado watch, a white gold diamond bracelet, and about $350 in cash.  They also ordered DeVault out of the car and tried to steal it, but failed when they could not get the car into gear.  DeVault returned fifteen minutes later to find his car where he had left it, still running with the keys in the ignition.  DeVault drove back to his house, and upon arrival, found a .38 revolver that one of the robbers had left inside the vehicle.

DeVault did not report the robbery to the police, but a detective contacted him about a month later.  DeVault corroborated the detective's account of the robbery, and turned over the firearm.  At trial, Winn identified the firearm as the same one that York carried during the UFCU robbery, and a Texas

No. 08-40406

Department of Public Safety expert testified that the bullet extracted from Mason's body matched the firearm recovered from DeVault's car.

The morning after the Mason shooting and the DeVault robbery, York met with Joseph. During their conversation, York reported the successful robbery and the unsuccessful attempt on Mason's life. York also showed Joseph the black Movado watch they had stolen.

A few days after the robbery, one of the robbers pawned a black Movado watch and a gold bracelet. Later, DeVault accompanied a law enforcement officer to the pawn shop and identified the pawned items as those stolen from him. An employee of the pawn shop produced pawn slips for the items with Senegal's signature.

Some time after the Mason shooting, Winn and York ended up in the same jail cell.[1] While there, York discussed the Mason shooting with Winn in great detail, and stated that he shot Mason with the same .38 revolver he had used in the UFCU robbery. A few days after the initial conversation, York told Winn about the DeVault robbery, describing their failure to steal the car and how they inadvertently left a gun in the vehicle.

5.    **The Texas City Arrest of York and Joseph**

In early October 2005, Texas City Police officers arrested York and Joseph in a stolen Buick.[2] Inside the car, officers found a .357 bulldog snub nose revolver that belonged to York, and a Colt .45 firearm that belonged to Senegal. At trial, Joseph identified Senegal's Colt .45 as the same weapon that jammed during the unsuccessful attempt on Mason's life.

---

[1] It is not clear from the record why the two were arrested or how they came to be in the same cell.

[2] Joseph testified that Senegal accompanied him and York the night of their Texas City arrest, but evaded capture by the authorities.

5

## B.    Procedural Background

A federal grand jury charged Senegal and York with eight counts.  These counts included (1) conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371 and 2113(a), (d); (2) aiding and abetting each other in robbing a bank by force and violence in violation of 18 U.S.C. §§ 2113(a), (d), and 2; (3) aiding and abetting each other in carrying, using, and brandishing one or more firearms during and in relationship to a crime of violence—bank robbery—in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; (4) aiding and abetting each other in possessing a Lorcin firearm while both were felons in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(4), (e), and 2; (5) conspiracy to tamper with a witness by attempting to kill him in violation of 18 U.S.C. § 1512(k); (6) aiding and abetting each other in an attempt to kill a witness with the intent to prevent the communication by the witness to law enforcement relating to the possible commission of a federal offense in violation of 18 U.S.C. §§ 1512(a)(1)(C) and 2; (7) aiding and abetting each other in carrying, using, and brandishing a firearm during and in relationship to a crime of violence—tampering with a witness—in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; and (8) aiding and abetting each other in possessing a .38 special caliber pistol while both were felons in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), (e), and 2.

Senegal and York pled not guilty and proceeded to a joint trial.  The Government introduced the testimony of Winn and Franklin, who both pled guilty and agreed to cooperate; Joseph; Mason, who identified Senegal as one of his assailants; Epps; Rolland; one of the tellers working at the UFCU on the day of the robbery; a landscape supervisor who followed the four after the UFCU robbery; DeVault; an employee of the pawn shop whom Senegal encountered when selling the stolen goods from the robbery; an expert who opined that the bullet recovered from Mason's body matched the gun left in DeVault's car; security photos from the UFCU robbery; and DNA evidence linking articles of

clothing left in the vehicles used in the UFCU robbery to Senegal and York. Senegal and York asserted that not a single witness told the truth, and raised various objections to the Government's evidence implicating them in Mason's shooting.

### 1.    Objections to Winn's Testimony

Before Winn testified, the district court heard arguments outside the presence of the jury to ascertain the substance of Winn's testimony regarding the conversations he had with York while in jail. Senegal argued that allowing Winn to testify would violate Senegal's right to confront York under *Bruton v. United States*, 391 U.S. 123 (1968).[3] The district court overruled Senegal's objection, finding that the statements were "integral to and a part of the entire conspiracy," and were thus covered by Federal Rule of Evidence 801(d)(2)(E).[4]

Once the jury returned, Winn testified that York stated that when the police arrested him and Joseph in Texas City, he possessed several firearms. This information went beyond Winn's proffer outside the presence of the jury. Senegal and York immediately moved for a mistrial, arguing that Winn's statement about the weapons alluded to evidence of other crimes, and that the Government violated Federal Rule of Evidence 404(b) by not disclosing their intent to introduce this testimony. The district court denied the motion.

### 2.    Objections to Joseph's Testimony

Senegal and York also vigorously objected to the testimony of Joseph in its entirety. The Government did not disclose its intent to call Joseph as a witness until three days before trial. During Joseph's direct examination, the Government asked him about his role as a paid informant with the Federal

---

[3] *Bruton* held that a codefendant's confession that implicated a defendant at a joint trial violated the defendant's Sixth Amendment Confrontation Clause right, and constituted reversible error. 391 U.S. at 136–37.

[4] Senegal does not appeal this ruling on *Bruton* grounds.

Bureau of Investigation ("FBI").  Joseph responded that he had cooperated with the FBI as an undercover informant since his Texas City arrest two years earlier, and that the FBI paid him approximately $1,500 for his work on matters not related to Senegal and York's case.  Senegal and York immediately objected, and the district court heard arguments outside the presence of the jury.

Senegal and York argued that they had inquired about whether the Government had made any agreements with any of their witnesses, and that the Government had not disclosed Joseph's work for the FBI.  The Government responded that it had no agreement with Joseph, and that although Joseph had worked for the FBI for two years, he had not provided any information for compensation in Senegal and York's case.

The FBI case agent for whom Joseph worked informed the district court that (1) Joseph had provided information as to narcotics trafficking and violent street gang activity; (2) Joseph participated in routine, ongoing investigations; (3) the FBI had made no specific promises to Joseph regarding mitigation of sentencing or dropping of charges that would suggest a compromise of impartiality; (4) most of the money paid to Joseph went to buying a cell phone so that FBI agents could keep in touch with him, and the rest went to financing Joseph's controlled purchases; (5) Joseph had not worked on any case related to any of the parties or witnesses who had testified for the Government in Senegal and York's case; and (6) Joseph had made no offer to "adjust or alter, modify, add to or delete from any testimony regarding facts about which he ha[d] personal knowledge in order to secure a conviction of any kind."

In response, Senegal and York requested the financial records documenting Joseph's compensation from the Government.  The district court denied this request, stating that Senegal and York could question Joseph about his finances on cross-examination.  Finding that Senegal and York suffered no undue prejudice from the Government's late disclosure of Joseph's financial

relationship with the FBI, the district court permitted Joseph to testify.  When Joseph testified about the Texas City arrest, Senegal and York objected again, arguing that the Government had not given them prior notice as to that portion of Joseph's testimony.  The district court overruled the objection.

### 3.    Actions of the District Court

Mason testified at trial, and although he identified Senegal as one of his assailants, he could not identify the other attacker.  In response to this testimony, Senegal and York called the officer who questioned Mason while paramedics tended to his gunshot wound. The officer testified that Mason, while being treated, stated that he did not know who shot him.

On cross-examination, the officer testified as to Mason's obvious extreme pain.  After the Government concluded its cross-examination, the district court judge asked the officer whether gunshot wound victims suffer from shock that affects their perception and ability to communicate.  The officer responded "I'm assuming it can, yes sir." Mid-way through the trial, the district court judge also stated to the jury "I've never had a hung jury in 17 years and you ain't going to be the first."

### 4.    Sentencing

Three days later, at the end of a six-day trial, the jury returned a guilty verdict against both Senegal and York on all eight counts.  Senegal and York both received (1) 60 months for Count 1; (2) 300 months for Count 2; (3) life for Count 3; (4) 240 months for Count 5; (5) 240 months for Count 6; and (6) life for Count 7.  Senegal received 360 months for Count 4 and 360 months for Count 8, while York received 120 months for Count 4 and 120 months for Count 8.[5]  The district court ordered that Counts 1, 2, 4, 5, 6, and 8 were to run concurrently,

---

[5] After the jury's verdict but before sentencing, Judge Samuel B. Kent, who had presided over the trial, recused himself from this case.  Judge Hayden Head took over the presiding role, and sentenced Senegal and York.

No. 08-40406

followed by Count 3's life term to run consecutive to Counts 1, 2, 4, 5, 6, and 8, and Count 7's life term to run consecutive to the other seven.  Senegal and York timely appealed.

## II.  DISCUSSION

We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Senegal and York allege that numerous constitutional, evidentiary, and statutory violations occurred during their trial and sentencing.  We address each of their arguments in turn.

### A.    *Brady* **Challenge as to Joseph's Status as a Paid Informant**

Senegal and York argue that the Government violated the Supreme Court's disclosure rule from *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to inform them that Joseph received payment for his work as an informant in unrelated cases.  We review allegations of *Brady* violations *de novo.  United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006).

To prove their alleged *Brady* violation, Senegal and York must show that "'(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material—i.e., there is a reasonable probability that if the [G]overnment had disclosed the evidence, the result of the proceeding would have been different.'" *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009) (quoting *United States v. Infante*, 404 F.3d 376, 386 (5th Cir. 2005)).  "A 'reasonable probability of a different result' is shown when the suppression 'undermines confidence in the outcome of the trial.'" *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Senegal and York have not met their burden of proving a *Brady* violation. We have held that "there can be no due process violation '[i]f the defendant received the material in time to put it to effective use at trial.'" *United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998) (quoting *United States v. McKinney*,

758 F.2d 1036, 1049–50 (5th Cir. 1985)) (alteration in original).  Therefore, the Government need not necessarily disclose *Brady* material prior to trial.  *See McKinney*, 758 F.2d at 1049 (refusing to impose a pre-trial disclosure rule based on *Brady*).  This is true even though evidence "was not disclosed as early as it might have and, indeed, should have been."  *Id*. at 1050.

If the Government delays revealing evidence, "the inquiry is whether the defendant was prejudiced by the tardy disclosure."  *Id*.  Because Senegal and York received information about Joseph's history as a paid informant with enough time to impeach him during cross-examination, they did not suffer prejudice.  Therefore the Government did not "suppress" Joseph's informant status in violation of *Brady*.

Additionally, we cannot say that Joseph's status as a paid informant in other cases was material.  Although the Supreme Court has held that impeachment evidence "falls within the *Brady* rule," *United States v. Bagley*, 473 U.S. 667, 676 (1985), had the Government's tardy disclosure prevented Senegal and York from cross-examining Joseph about his informant status, we would still have confidence in the verdict.  Although Joseph gave damning testimony, the Government introduced abundant evidence of Senegal and York's guilt through other means, as discussed *inter alia*.

## B.    Hearsay Challenges as to Rolland, Franklin, Winn, and Joseph's Testimony

Senegal, but not York, argues that the district court improperly admitted the following hearsay statements: (1) Rolland's testimony that she overheard Senegal and York plan to murder Mason; (2) Franklin's testimony that he talked with Senegal and York about killing Mason; (3) Winn's testimony about the conversation between Winn and York in jail in which York admitted his involvement in the Mason shooting; and (4) unspecified portions of Joseph's testimony.  We review "evidentiary rulings on a heightened abuse of discretion

11

basis," but "[e]ven an abuse of discretion may not merit reversal if the error . . . was harmless." *United States v. Franklin*, 561 F.3d 398, 404 (5th Cir. 2009). A hearsay challenge is non-constitutional, and "[n]on-constitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *United States v. Simmons*, 374 F.3d 313, 320 (5th Cir. 2004)) (internal quotation marks omitted).

Federal Rule of Evidence 801(d)(2)(E) states that "[a] statement is not hearsay if [it is] . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In order to satisfy Rule 801(d)(2)(E), "[t]he [G]overnment must prove by preponderance of the evidence '(1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy.'" *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005) (quoting *United States v. Robinson*, 367 F.3d 278, 291–92 (5th Cir. 2004)). "The conspiracy that forms the basis for admitting the coconspirators' statements need not be the same conspiracy for which the defendant is indicted." *United States v. Elashyi*, 554 F.3d 480, 503 (5th Cir. 2008) (quoting *Delgado*, 401 F.3d at 299) (internal quotation marks omitted).[6]

### 1.    Rolland's Testimony

Senegal argues that the district court should have barred as hearsay Rolland's testimony regarding Senegal and York's conversations about planning to attack Mason. He alleges that the conversations did not further any

---

[6] Senegal argues that because some of the statements were not made *to* coconspirators, the district court abused its discretion by admitting them under Rule 801(d)(2)(E). Nothing in the rule suggests that a member of the conspiracy must report the statement in order to satisfy the rule, and we have held that the Government satisfies the rule even when the *target* of a murder conspiracy testifies as to statements made by coconspirators. *See Robinson*, 367 F.3d at 291–92.

conspiracy, but amounted only to "idle chatter." *Cf. United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) ("'Mere idle chatter', [sic] even if prejudicial and made among co-conspirators, is not admissible under Rule 801(d)(2)([E]).") (citing *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983)).

At trial, Rolland testified explicitly that she did *not* overhear any conversation between Senegal and York in which they discussed their plan to kill Mason. Senegal's argument seems to refer to the Government's introduction of Rolland's grand jury testimony in which she reported overhearing Senegal and York plotting their attack. The district court, however, instructed the jury that it could only consider Rolland's grand jury testimony for impeachment purposes, and not as substantive evidence as to any of the charged counts. Senegal's argument, therefore, entirely lacks merit.

### 2.    Franklin's Testimony

Senegal argues that any discussion among Franklin, Senegal, and York regarding the Mason shooting occurred after the conspiracy to murder Mason ended, and therefore does not fall under Rule 801(d)(2)(E). Any statements made by Senegal to Franklin implicating himself in Mason's shooting are, however, admissible as an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(A), which provides that "[a] statement is not hearsay if . . . [it] is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

Additionally, Senegal misstates the record. Although Franklin testified that Winn informed him after Mason's shooting that Senegal and York had committed the attack, Franklin also testified to a conversation between himself, Senegal, and York before the shooting, in which Senegal and York discussed their desire to kill Mason, and in which Franklin advised them against doing so. Because the Government has shown that (1) a conspiracy between Senegal and York to kill Mason existed; (2) Senegal and York, as the coconspirators, made the

challenged statements; (3) Senegal and York made many of the statements during the course of the conspiracy; and (4) Senegal and York made the statements in furtherance of the conspiracy, we find that the district court did not abuse its discretion by admitting most of Franklin's testimony. *See Delgado*, 401 F.3d at 298. We also find that admission of any of Franklin's statements that reported conversations that occurred after the Mason shooting was harmless beyond a reasonable doubt.

### 3.    Winn's Testimony Concerning his Jailhouse Conversation with York

Senegal argues that the district court erred by allowing the Government to introduce Winn's testimony regarding York's jailhouse conversations with Winn because these conversations occurred well after the conspiracies to rob the UFCU and to silence Mason ended, and therefore do not meet the strictures of Rule 801(d)(2)(E). Senegal's argument is not without merit, as we have noted that "[t]here can be no furtherance of a conspiracy that has ended." *United States v. Nall*, 437 F.2d 1177, 1182 n.5 (5th Cir. 1971). Because these conversations occurred after the conclusion of all the relevant conspiracies, the district court abused its discretion by admitting them.

The Government has, however, proved that this error was harmless beyond a reasonable doubt. Even without Winn's testimony, the Government produced overwhelming evidence of Senegal's involvement in Mason's shooting. This evidence included (1) Mason's identification of Senegal as one of the attackers, (2) Franklin's testimony, (3) Joseph's testimony, and (4) the evidence tying the bullet extracted from Mason to the gun York left in DeVault's car, combined with Senegal's signature on the pawn slips for the items stolen from DeVault. We cannot say that the district court's error had a "substantial and injurious effect or influence in determining the jury's verdict." *Franklin*, 561 F.3d at 404.

No. 08-40406

### 4.    Joseph's Testimony

Senegal does not clearly state which part of Joseph's testimony he finds objectionable. The only questionable testimony involved Joseph's conversation with York in which York implicated Senegal in Mason's shooting after it had taken place. Although this particular part of Joseph's testimony does not satisfy the coconspirator exception to the hearsay rule, most of his testimony does, as it either reported the substance of conversations with Senegal, thereby satisfying Rule 801(d)(2)(E) as an admission by a party opponent; or reported conversations occurring before Mason's shooting where York and Senegal discussed killing Mason, thereby satisfying Rule 801(d)(2)(E) as a statement by a coconspirator. Based on the abundance of admissible evidence, we find that any error in admitting portions of Joseph's testimony was harmless beyond a reasonable doubt.

### C.    Evidentiary Challenges to the District Court's Admission of Evidence Relating to the DeVault Robbery and the Texas City Arrest

Senegal and York argue that the district court violated Federal Rule of Evidence 404(b) by allowing various witnesses to testify about Senegal and York's involvement in two unindicted crimes: the DeVault robbery and the Texas City arrest. We review evidentiary rulings for abuse of discretion, subject to harmless error review. *United States v. Crawley*, 533 F.3d 349, 353 (5th Cir. 2008).

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but "[i]t may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." In order to satisfy Rule 404(b), the Government must, "upon request by the accused . . . provide reasonable notice

in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." FED. R. EVID. 404(b).

In *United States v. Beechum*, we established a two-part test for the admission of an "extrinsic offense" under Rule 404(b). 582 F.2d 898, 911 (5th Cir. 1978) (en banc). "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character." *Id.* Upon satisfaction of the first prong, "the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." *Id.*

We have also held that "Rule 404(b) is only implicated when the offered evidence is extrinsic; evidence intrinsic to the charged offense does not implicate the rule." *Crawley*, 533 F.3d at 353–54. If we conclude that the additional crimes are intrinsic to any of the charged offenses, then "'consideration of [their] admissibility pursuant to Rule 404(b) [is] unnecessary.'" *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999) (quoting *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994)) (some alteration in original). "'Other acts' evidence is intrinsic when it is inextricably intertwined with the charged offense, when both acts are part of the same criminal episode, or when the 'other act' was a necessary preliminary step toward the completion of the charged crime." *Crawley*, 533 F.3d at 354 (citing *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007)).

### 1.    The DeVault Robbery

The district court did not err when it allowed the Government to introduce testimony about the DeVault robbery. Rule 404(b) allows the Government to admit evidence of prior bad acts to prove identity, and the evidence recovered from the DeVault robbery tends to prove the identity of Senegal and York as

Mason's attackers. The Government informed Senegal and York of their plan to introduce evidence of the DeVault robbery, in compliance with Rule 404(b).

The Government has also satisfied *Beechum*'s two-pronged test. The DeVault robbery and the evidence surrounding it were "relevant to an issue other than the defendant's character"; namely, the identity of Mason's assailants. *Beechum*, 582 F.2d at 911. Additionally, the probative value of the evidence gathered from the DeVault robbery far surpassed the prejudice alleged by Senegal and York, who argue that the evidence concerning the DeVault robbery implies that they habitually commit armed robberies, which could lead a jury to believe that they possessed firearms and committed other armed crimes habitually. The district court did not abuse its discretion by admitting testimony about the DeVault robbery.

### 2.    The Texas City Arrest

In contrast, we find that the district court abused its discretion by allowing the Government to introduce evidence of Senegal and York's Texas City arrest. The Government argues that the Texas City arrest is intrinsic because the police recovered a .45 caliber firearm that Joseph testified was the same one that Senegal misfired while attempting to kill Mason. This connection, however, is too attenuated for us to conclude that the offenses were inextricably intertwined. *See Crawley*, 533 F.3d at 354 (citing *Sumlin*, 489 F.3d at 689). Likewise, the Government cannot justify admitting this evidence as extrinsic under Rule 404(b) because it did not give Senegal and York any "reasonable notice in advance of trial, or during trial" about its intent to introduce the evidence. FED. R. EVID. 404(b).

The district court's error in admitting this testimony, however, was harmless beyond a reasonable doubt. As discussed above, the Government introduced abundant admissible evidence of Senegal and York's guilt on all counts. In addition to this overwhelming evidence, the district court gave the

jury a cautionary instruction before admitting evidence of both the DeVault robbery and the Texas City arrest. *See Crawley*, 533 F.3d at 355 ("Even assuming, therefore, that admission of the extrinsic evidence posed a risk of undue prejudice, that risk was greatly minimized by the court's limiting instruction."). We find that Senegal and York have not demonstrated reversible error.

### D.    Sufficiency of the Evidence Challenge as to York's Conviction for Aiding and Abetting Senegal's Possession of a Lorcin Pistol

York, but not Senegal, appeals his conviction under Count 4, which charged him with aiding and abetting Senegal's possession of a Lorcin pistol while Senegal was a convicted felon. York argues that because Rolland, Senegal's girlfriend, recanted her grand jury testimony and refused to testify at trial that York brought the Lorcin pistol to her house, the Government has not produced sufficient evidence to convict York of aiding and abetting Senegal's possession of the weapon. Although the Government impeached Rolland with her grand jury testimony under Federal Rule of Evidence 607, Rolland never adopted those statements at trial, and the district court limited the jury's consideration of Rolland's grand jury testimony to use for impeachment purposes only.[7]

The jury found York guilty of the charge in Count 4, and our "review of the sufficiency of the evidence is 'highly deferential to the verdict.'" *Elashyi*, 554 F.3d at 491–92 (quoting *United States v. Gulley*, 526 F.3d 809, 816 (5th Cir. 2008)). We ask "'whether the evidence, when reviewed in the light most favorable to the [g]overnment with all reasonable inferences and credibility

---

[7] *See Gower v. Cohn*, 643 F.2d 1146, 1153 n.11 (5th Cir. 1981) ("Where a limiting instruction is given, the jury may consider the prior inconsistent statement only as impeachment, and not as substantive evidence."); *see generally United States v. Dennis*, 625 F.2d 782, 795–96 (8th Cir. 1980) ("Whether to admit [prior inconsistent statements] as substantive evidence or to limit their use to impeachment is within the broad discretion of the trial court.").

choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt.'" *Id*. at 492 (quoting *Gulley*, 526 F.3d at 816) (alteration in original).

Although the jury could not consider Rolland's grand jury testimony as evidence of York's guilt, the Government produced other evidence as to York's participation in Senegal's possession of the Lorcin pistol. Specifically, Winn identified the Lorcin pistol as the weapon Senegal used and brandished during the UFCU robbery, and security photographs taken during the UFCU robbery showed York near Senegal while Senegal brandished the weapon. Considering this evidence "in the light most favorable to the [g]overnment with all reasonable inferences and credibility choices made in support of a conviction," we cannot say that no rational fact finder could find York guilty beyond a reasonable doubt of aiding and abetting Senegal's possession of the Lorcin pistol. *Id*. (quoting *Gulley*, 526 F.3d at 816) (alteration in original). We thus affirm York's conviction on Count 4.

**E.    Challenge to the District Court's Statements**

Senegal and York argue that the district court judge exhibited "manifest partiality" that deprived them of their constitutional right to a fair trial. After the officer who responded to the Mason shooting testified that Mason could not identify his assailants immediately after the attack, the district court judge asked the officer whether gunshot wound victims suffer from shock that affects "their judgment, their perception, [and] their ability to communicate." The officer responded "I'm assuming it can, yes sir." Senegal and York argue that the district court asked this question in an attempt to undermine the defense.

Senegal and York also allege bias in the district court judge's statement that "I've never had a hung jury in 17 years and you ain't going to be the first." They argue that this statement implied that the jury need not partake in any true, good faith deliberation over Senegal and York's guilt.

19

When faced with a complaint that a judge's misconduct gives the appearance of partiality, we must "determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial." *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994) (citing *United States v. Williams*, 809 F.2d 1072, 1086 (5th Cir. 1987)). "To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *Id.* (citing *United States v. Samak*, 7 F.3d 1196, 1197–98 (5th Cir. 1993)). When considering the challenged remarks, we must also place them in the "proper context by viewing the totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions," and before we may reverse, "[t]he totality of the circumstances must show that the trial judge's intervention was quantitatively and qualitatively substantial." *United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998) (quoting *Bermea*, 30 F.3d at 1569) (internal quotation marks omitted).

We find that the district court's limited questioning of the officer was not inappropriate. Federal Rule of Evidence 614(b) allows the district court to "interrogate witnesses, whether called by itself or by a party," and we have held that "[a] federal district judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel." *United States v. Wallace*, 32 F.3d 921, 928 (5th Cir. 1994) (citing *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. 1981)). We find that the district court's *de minimus* examination of the officer did not prejudice either Senegal or York.

Viewing the entirety of the district court's comments to the jury is illustrative. The district court's statement reads:

No. 08-40406

> Look, my expectation is that we're going to finish the record tomorrow and that we will very likely argue the case and submit it to you for deliberations. Whether you reach a verdict tomorrow or spend the rest of your lives doing it is your business. *I've never had a hung jury in 17 years and you ain't going to be the first.* So get some rest, be refreshed. Be ready to go. This is hard work. And when it comes to your turn to be judges of the facts, you're gong [sic] to see what I'm talking about. It is hard work. So be ready to go. Thank you for your attention.

Senegal and York's argument that the district court implied that the jury need not seriously deliberate their guilt or innocence is entirely baseless. In context, the district court's statement implored the jury to prepare to take their job very seriously, and suggested that they should take as much time as necessary to reach the correct result. The record does not suggest that this comment prejudiced Senegal or York in the least. Even when combined, the district court's actions do not rise to the level of reversible error.

**F.    Challenge to the District Court's Sentence**

On appeal, Senegal, but not York, argues that the district court erred in several ways when it imposed his sentence. He did not, however, make any objections to his sentence before the district court, and we thus review for plain error. To prove plain error, Senegal "must show (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Clark*, 582 F.3d 607, 616 (5th Cir. 2009) (quoting *United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008)) (internal quotation marks omitted). Even if Senegal satisfies all the elements of plain error review, "the decision to grant relief is entirely discretionary." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 735–36 (1993)).

21

No. 08-40406

1.  **Consecutive Sentences under 18 U.S.C. §§ 924(c)(1)(A) and
    924(e)**

Senegal argues that the district court erred by imposing consecutive sentences for his convictions under 18 U.S.C. § 924(e), which prohibits being a felon in possession of a firearm and carries a fifteen-year mandatory minimum sentence, and 18 U.S.C. § 924(c)(1)(A), which imposes an additional, yet shorter, mandatory minimum punishment for possessing a firearm while committing a crime of violence.  Senegal cites the Second Circuit's decision in *United States v. Whitley*, which held that the text of § 924(c)(1)(A) "exempt[ed the defendant] from the consecutive ten-year minimum sentence for discharging a firearm because he is subject to the higher fifteen-year minimum sentence provided by section 924(e)." 529 F.3d 150, 158 (2d Cir. 2008).  He acknowledges that we have allowed a district court to impose consecutive sentences for violations of § 924(c)(1)(A) and a statute with a longer minimum mandatory sentence, *see United States v. Kyles*, 304 F. App'x 268, 269–70 (5th Cir. 2008) (per curiam) (unpublished)*; United States v. Collins*, 205 F. App'x 196, 197–98 (5th Cir. 2006) (per curiam) (unpublished)*, but contends that *Whitley* proves that the district court imposed a sentence that is "plainly excessive."

Although the Second Circuit's reasoning applies to Senegal's situation, he cannot demonstrate plain error.  After Senegal filed his brief in this case, we adopted, in a published opinion, the reasoning and holding set forth in *Collins*. *See United States v. London*, 568 F.3d 553, 564 (5th Cir. 2009).  *London* binds our analysis, and precludes Senegal's claim that the district court plainly erred when making this sentencing determination.

2.  **Double Jeopardy**

Senegal also argues that because the jury found him guilty of violating 18 U.S.C. § 924(e) for being a felon in possession of a firearm, and 18 U.S.C. § 924(c)(1)(A) for possessing a firearm while committing a crime of violence, and

22

both offenses involved the same firearm, his convictions violate the Double Jeopardy Clause.    Senegal cites *United States v. Medellin-Torres* for the proposition that "convictions and sentences, which were based on possession of the same weapon, are multiplicitous and violate double jeopardy."  293 F. App'x 354, 354–55 (5th Cir. 2008) (per curiam) (unpublished).  Both *Medellin-Torres* and the case it relies on, *United States v. Munoz-Romo*, 989 F.2d 757 (5th Cir. 1993), addressed defendants convicted for multiple violations of 18 U.S.C. § 922(g), which prohibits certain classes of individuals from possessing firearms and whose subsections "differ[] only in [their] requirement that the offender have a certain 'status' under the law."  *Munoz-Romo*, 989 F.2d at 759 (internal quotation marks omitted).

Senegal's argument is without merit.  In *Munoz-Romo*, we held that "the language and structure of Section 922(g) disclose Congress's clear intent not to impose cumulative punishments when the same *incident* violates *two subdivisions of subsection (g)*," in part, because "[t]he two subdivisions at issue here are found in a single subsection of a statute that prescribes a single penalty for all of those subdivisions."  *Id.* (emphases added).  We also noted that "the statute's structure indicates that Congress sought 'only to bar the possession of firearms by certain types of persons that it considered dangerous,' and not to punish persons 'solely for having a certain status under the law.'"  *Id.* (quoting *United States v. Winchester*, 916 F.2d 601, 605–06 (11th Cir. 1990).  We held that Congress did not intend that "a convicted felon who is also a fugitive from justice, a drug addict, a mental defective, and an illegal alien, could be sentenced to five consecutive terms of imprisonment for the *same incident*, namely, the possession of a firearm."  *Id.* (quoting *Winchester*, 916 F.2d at 607) (emphasis added) (internal quotation marks omitted).

We do not have any of the same concerns in this case.  Senegal received separate sentences for being a felon in possession of a firearm and for possessing

No. 08-40406

a firearm while committing a crime of violence.  The two offenses punish different incidents, and both sections enumerate distinct penalties.  *Compare* 18 U.S.C. § 924(e), *with* 18 U.S.C. § 924(c)(1)(A).  That Senegal used the same weapon during the course of committing both offenses is irrelevant; while his conviction under § 924(e) imposed a punishment for possessing a firearm while having the *status* of a felon, his conviction under § 924(c)(1)(A) punished his *use* of a firearm.  We hold that Senegal's convictions for violations of 18 U.S.C. §§ 924(e) and 924(c)(1)(A) do not violate the Double Jeopardy Clause.

### 3.    *Apprendi/Booker*

Senegal argues that the district court improperly applied a sentence enhancement based on its finding that Mason suffered life-threatening injuries from the shooting.  Senegal asserts that without that finding, the district court would not have calculated his Federal Sentencing Guidelines range as 360 months to life for Counts 3 and 7,[8] and that because the jury did not make the determination as to the extent of Mason's injuries, his sentence violates the rules set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005).  Because the district court had statutory authorization to impose a life sentence for these two Counts, Senegal's argument fails.

*Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  Once the jury's findings establish the statutory maximum, however, the district court can make findings as to

---

[8] Senegal's argument regarding the district court's determination that Mason suffered life-threatening injuries does not appear relevant to Count 3, which charged Senegal with carrying, using, and brandishing a firearm during the UFCU robbery in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2.  Because § 924(c)(1)(A) gave rise to both counts, the following analysis applies equally to both, although Senegal's reasoning seems relevant only to Count 7.

additional information that would cause it to impose a higher or lower sentence within the statutorily authorized range. *See Booker*, 543 U.S. at 233 ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."). We have held that "[p]ost-*Booker*, a district court may sentence a defendant on facts not established by either a guilty plea or jury verdict, as long as the [facts] ha[ve] been proven by a preponderance of the evidence." *United States v. Valles*, 484 F.3d 745, 760 (5th Cir. 2007) (citing *United States v. Valdez*, 453 F.3d 252, 264 (5th Cir. 2006)(citation omitted)).

The statute giving rise to Counts 3 and 7 provides that using a firearm during a crime of violence results in penalties "in addition to the punishment provided for such crime of violence." 18 U.S.C. § 924(c)(1)(A). Specifically, § 924(c)(1)(A) instructs the district court to impose "not less than 5 years" for using or carrying a firearm, "not less than 7 years" for brandishing a firearm, and "not less than 10 years" for discharging a firearm. We have held that "in the absence of a statutory maximum penalty, the maximum penalty when a term of not less than a certain number of years is provided, means that the maximum is life imprisonment." *United States v. Sias*, 227 F.3d 244, 247 (5th Cir. 2000).

Because § 924(c)(1)(A) has no maximum penalty, the district court had statutory authorization to impose life sentences on Senegal for Counts 3 and 7. The district court concluded that Mason suffered permanent or life threatening injuries, looked to the advisory Federal Sentencing Guidelines, and applied the four level increase authorized under § 2A2.1(b)(1)(A). This increase resulted in a recommended sentence of 360 months to life, and the district court did not plainly err by choosing a sentence at the upper limit of the suggested range. *See United States v. Campos-Maldonado*, 531 F.3d 337, 338 (5th Cir. 2008) ("A

No. 08-40406

discretionary sentence imposed within a properly calculated guidelines range is presumptively reasonable." (citing *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir. 2006))).

## III.  CONCLUSION

Senegal and York have not demonstrated any meritorious reason for disturbing either their convictions or their sentences.  For the reasons discussed above, we affirm their convictions in their entirety.

AFFIRMED.